

Kenneth Barker
2349 Royal Oaks Drive,
Alamo, CA. 94507.
Phone ( 925 ) 820 -0198
Fax.   ( 925 ) 820- 0198

Plaintiff In Pro Se.

FILED

AUG - 1 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

KENNETH BARKER, and
LOIS ANNE BARKER,
      Plaintiffs
        v.
DEFAULT RESOLUTION
NETWORK; FIDELITY NATIONAL
TITLE INSURANCE CO.;
MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC;
ALBORG, VEILUVA & EPSTIEN;
TITLE COURT SERVICES INC;
GENPACTMORTGAGE SERVICES,
DOES 1 through 50 INCLUSIVE.

      Defendants.

Case No 08 CV 02898 CW

**OPPOSITION TO DEFENDANT
MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS
INC., ALBORG VEILUVA &
EPSTEIN,LLP, AND GENPACT
MORTGAGE SERVICES'
AMENDED NOTICE OF
MOTION TO DISMISS
KENNETH BARKER AND
LOIS ANNE BARKER'S
COMPLAINT.**
[ Fed. R.Civ. P. 12 (b) (6 )]

## MEMORANDUM OF POINTS AND ATHOURITIES FILED BY

## PLAINTIFFS IN OPPOSITION TO ALBORG DEFENDANTS MOTION TO

## DISMISS THE  BARKER'S COMPLAINT

1.

## INTRODUCTION

1 ) This complaint involves allegations by plaintiffs Kenneth Barker, and Lois Anne

Barker, for violations by defendants of The Racketeer Influenced And Corrupt

Organization Act ( RICO )  (18 U.S.C.S 1961-1968 ) for the following conduct:

2 ) Defendants are an association in fact, acting jointly as a racketeering enterprise,

engaged in an illegal scheme, via a pattern of fraud, misrepresentation, and conspiracy, to

defraud plaintiffs for defendants illegal financial gain, by filing a fraudulent non judicial

foreclosure notice without owning the Note or Mortgage at the time the foreclose notice

was filed. Tellingly, defendant in it's Motion to Dismiss ( page 1 -lines 24-25 ) states:

" *The beneficial interest in the mortgage is held by defendant Genpact.*"

However, and noteworthy, the Foreclosure Notice  ( page 2 ) states just the opposite. It

states that the beneficiary is *Mortgage Electronic Registration Systems, Inc.*

The truth is neither Genpact, nor Mortgage Electronic Registration Systems ( MERS )

owned the Note or Mortgage, at the time the foreclosure was filed. Furthermore, what the

alleged "... beneficial interest... " in the mortgage legally  means is left unexplained by

defendants. Unquestionably, "... beneficial interest... " does not mean that defendants own

the Note or Mortgage, which is mandatory before a Foreclose Notice can be legally filed.

Obviously, defendants know this. Thus, defendant's "... beneficial interest..." gobble-de

gook double talk, is for the purpose  masking the complained of Foreclosure Notice fraud.

Unquestionably, if Genpact or MERS owned the Note or Mortgage it would be a simple

matter for them to produce a copy of the same to the Court. However, defendant's failure

to do so, brings into very sharp focus it's fraud and resulting violations of civil RICO.

The non judicial foreclosure process requires the services of law firms, attorneys, mortgage

servicers, title companies, and their agents. All of whom are paid from the proceeds of the

fraudulent foreclosure, without any Court review or approval.

3 ) Defendants claim that plaintiff owes defendant $750,000.00 plus a further sum of

2.

$ 137, 818.75 as of April 30, 2008. The charges, plus additional ongoing legal fees, and

other costs, are trumped up, inflated, and fraudulent.

These fraudulent charges are part of the racketeering enterprise. Alborg defendants, ( see

below ) have also committed multiple civil RICO violations via an illegal scheme of

undisclosed kickback/sharing of attorney fees, with a non law firm corporate entity.

( Fidelity National Title Insurance Company )

4 ) On May 1,2008 defendants filed a non judicial Notice Of Default And Election To Sell

Under Deed Of Trust ( hereinafter NOD ) plaintiff's premises which are located at 2349

Royal Oaks Drive, Alamo. CA 94507. The NOD was served on plaintiffs on May 8, 2008.

5 ) On June 10, 2008, pursuant to 18 U.S.C. Section 1961-1968, plaintiffs filed a complaint

For Violations of Racketeering Influenced And Corrupt Organizations Act ( RICO )

against six ( 6 ) named defendants. Namely: Default Resolution Network, Fidelity

National Title, Mortgage Electronic Registration Systems, Inc., Alborg Veiluva & Epstein,

Title Court Services, Inc., Genpact Mortgage Services, and DOES 1 through 50 inclusive.

6 ) On June 30, 2008, defendant Title Court Services, denied all allegations.

7 ) On July 1, 2008, defendants Mortgage Electronic Systems, Alborg, Veiluva & Epstein,

and Compact Mortgage Services, answered the complaint. They denied all allegations and

claimed plaintiff had failed to state a claim upon which relief can be granted. Fed. R. Civ.

P. 12 ( b ) ( 6 ).

8 ) On July 3, defendant Fidelity National Title and Default Resolution Network answered

the complaint. They denied all allegations and claimed plaintiff had failed to state a claim

upon which relief can be granted. F. R. Civ. P 12 ( b ) ( 6 ).

3.

9 ) Plaintiff hereby opposes defendants Motions to Dismiss pursuant to Fed. R. Civ. P. 12

( b ) ( 6 ), and provides the following in opposition to Defendants Motion to Dismiss.

## 11.

## BACKGROUND TO THE COMPLAINT

10 ) The ongoing sub-prime mortgage crisis has created an unprecedented rate of home

foreclosures throughout the United States which is probably even worse than the Great

Depression of 1934. As of July 2008, the Federal Government stated  the rate of

foreclosure notices had surged to a new high, with 8,400 NODS being filed every day

( i.e. 2,200,000 home foreclosures per year ). California, Nevada, and Florida, are the

hardest hit states, with California experiencing about 1,200 NODS every day.

11 ) As  shown by this action, and many others, the sub prime mortgage crisis has spawned

greatly increased opportunities for illegal conduct via rampant fraud for non judicial

foreclosures. Securitized trusts have filed large numbers of fraudulent non judicial NODS,

because  they never owned  the Note, or Mortgage, at the time of filing the NOD.

Critically, for nonjudicial foreclosures under a Deed of Trust, there is no oversight by the

Court for alleged foreclosure charges, legal fees, and costs, nor is there any need for the

trust deed beneficiary to commence a lawsuit.

12 ) These unsupervised foreclosure conditions in the context for millions of ongoing

NODS, provides very fertile breeding grounds for unscrupulous *" evil empire "*

racketeering enterprises,  such as defendants, and resulting civil RICO violations .

13 ) Plaintiffs allege defendants are text book examples of a civil RICO " Predatory

Foreclose Mill ", involved in thousands of NODS. Defendants are associated in fact,

acting jointly as a racketeering enterprise, engaged in an illegal scheme, via a pattern of fraud, mis-representation, and conspiracy, using the U.S. Mails and Interstate Wires for their unlawful financial gain to defraud plaintiffs.

**111.**

## PLAINTIFFS LEGAL RIGHT TO FILE A RICO COMPLAINT.

14 ) A civil RICO cause of action is created by 18 U.S.C. Section 1964 ( c )

" Any person in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States District Court and shall recover threefold the damages he sustains and the cost of the suit ..."

15 ) As described below, plaintiffs have been injured by defendants wrongful and fraudulent conduct. Therefore, plaintiffs have legal standing to sue defendants, being entitled to recover threefold the damages that are sustained.

16 ) **Fraud By Defendants--Filing A False Non Judicial Foreclosure Notice.**

Plaintiff's lawsuit sets forth cognizable legal theories. Plaintiffs lawsuit at page 3, line 11, to page 4, line 21, sets forth the case for RICO violations flowing from defendants filing of a NOD without owning the Note or Mortgage at the time of filing the NOD.

17 ) Plaintiff's lawsuit at page 6, line 14, to page 7, line 8, provides a summary of recent decisions rendered by three ( 3 ) Federal District Judges ( i.e. Honorable Federal Judges: Boyko, O' Malley, and Rose ).These Federal Judges were unanimous in throwing out seventy two ( 72 ) NODS that were filed without proof that the claimant owned the Note, or Mortgage, at the time the NODS were filed.

18 ) Plaintiff's lawsuit at page 7, lines 16 to 27, provides a summary of United States Bankruptcy Court ordered sanctions ranging up to $250,000.00, imposed against Wells

Fargo Bank, and it's mortgage servicer, and their attorneys. Federal Bankruptcy Judge Joel Rosenthal imposed these sanctions for false and concocted evidence, and for lying, claiming Wells Fargo owned the mortgage when it filed the NOD, when it did not.

19 ) **Fraud By Defendant Via False And Inflated Legal Bills And Illegal Kickbacks**

Plaintiffs lawsuit at page 4, line 22, to page 5, line 16, alleges that defendant committed fraud for claiming that amounts owed were $750,000.00 and $ 137,818.75 as of April 30, 2008, for the Mortgage and for various alleged unpaid legal fees and costs.

20 ) Defendant, Fidelity is a large title company with many branches with yearly revenues of about $450,000,000.00. It operates on a nation wide basis. Fidelity is the parent company of Default Resolution Network. Both companies have the same address which is : 50 California Street, Suite 3550, San Francisco, CA. Both companies employ the same law firm, ( Holland & Knight ) for defense of this lawsuit. Fidelity also operates company divisions such as " Fidelity Information Services D/B/A " Fidelity National Foreclosure and Bankruptcy Solutions " for it's nation wide foreclosure business. Additionally, Fidelity operates nationwide under the names of Fidelity Title/Chicago Title/Alamo Title/Ticor Title/Security Union Title.

21 ) Genpact Mortgage Service, Inc. is the parent company of Mortgage Electronic Registration Service , Inc. ( hereinafter MERS ) Both companies employ the same law firm, Alborg, Veiluva & Epstein for defense of this lawsuit.

22 ) Mortgage servicing companies such as ( MERS ) is the company listed in the NOD as beneficiary, and not Genpact Mortgage Services, Inc. as falsely stated ( above), by defendants.

23 ) Fidelity acts as a secret middleman between many of these mortgage companies and

6.

the law firms that appear on behalf of the mortgage servers. According to it's Executive

Chairman, Fidelity's " Lender Processing Services " provides " comprehensive data,

servicing, and technology solutions to large scale mortgage servicing lenders."

24 ) In fact, Fidelity's " comprehensive " role is really that of a secret puppet master of the

law firms that handle bankruptcies and foreclosures on behalf of mortgage serving lenders.

These law firms ( Alborg, and Holland ), collect their fees by tendering their bills

through Fidelity, and then on to the mortgage servicer in this case MERS, ( Genpact )

which then charges plaintiffs without ever obtaining the Court's approval.

25 ) Fidelity has a  nation wide *" Network Agreement "* ( see below ) governing it's

relationships with it's law firms, such as Alborg, and Holland. Fidelity utilizes an illegal

scheme of fee splitting legal fees with it's attorneys for moneys generated in  bankruptcy

and foreclosure cases. The fees that the Fidelity controlled law firms charge are set by

Fidelity. They are inflated by 25% to 50%. Law firms like Alborg, and Holland, kick back

the extra inflated  fee to Fidelity ( see below ) as part of the nation wide  *" Network*

*Agreement*. " These are predicate acts are text book examples of civil RICO violations.

26 ) **Fidelity's Secret Deals With Mortgage Companies and Law Firms.**

Fidelity, on a nation wide basis, uses two sets of agreements in it's systemic secret

kickback scam. The *" Default Services Agreement. "* is for mortgage servicers like MERS

( Genpact ), and it's *" Network Agreement. "* is for  law firms like Alborg, and Holland.

Copies of the standard agreements along with copies of the ongoing illegal fee

7.

splitting/ kick back schedule between Fidelity and it's *"Network "* attorneys, were

obtained from filed Court records for an ongoing class action lawsuit filed In The United

States Bankruptcy Court of The Southern District Of Texas, Houston Division,

*( Case No. 03-44826- H4-23 )* and are set forth in pages 25 to 36 of **Exhibit No. 1.**

27 ) Fidelity's " *Network Agreement* " and that of it's *"Network ."* attorneys, ( Alborg and

Holland ) are criminal conduct under 18 U. S. C. Section 155. It provides that any party

in interest commits a crime when that entity or it's representative:

*" knowingly and fraudulently enters into an agreement for purpose of fixing the fees or*

*other compensation to any party in interest or to any attorney for any party in interest*

*for services rendered in connection therewith, from the assets of the estate ".*

Under Section 155, such conduct is punishable by both fines and prison time.

28 ) Fidelity's *" Network Agreement ."* also places it's *"Network."* attorneys

( Alborg and Holland ) in violation of multiple ethical rules  which forbid fee-splitting.

Specifically: California State Bar rules provide that:

*" Neither a member ( of the California State Bar ) nor a law firm shall directly or*

*indirectly shall  share legal fees with a person who is not a lawyer..."*

with exceptions inapplicable here. Violations are punishable by disciplinary action,

including fines, suspension, and for egregious violations ( such  as this case, ) debarment.

See Cal. R. Prof. Cond.1-320  (A).

**A )The " Default Services Agreement."**

29) Fidelity enters into " *Default Service Agreements."*  with various mortgage servicing

companies. Figure 1 below, illustrates these relationships.

8.



Figure 1: Fidelity's **"*Default Services Agreements*"** with Mortgage Companies.

30 ) Under the "**Default Services Agreement.**" mortgage servicers cede control over their accounting and legal affairs, and the hiring of the lawyers that appear on their behalf, to Fidelity. ( See pages 32 and 33 of **Exhibit 1** )

31 ) Fidelity obtains the right and power to chose and manage and set the fees for the law firms that will appear on on behalf of the mortgage servicing company.

32 ) Fidelity and each mortgage servicer signatory to the "**Default Services Agreement.**" agree to keep the terms of the agreement secret. ( See **Exhibit 1**-- page 28, Section 11, "**Confidentially.**" )

33 ) Fidelity never appears as a party. Thus, when mortgage servicers such as MERS ( Genpact ) appear in Court, their lawyers act at the behest of Fidelity who is their secret puppet master, about whose role the Court knows nothing. Fidelity's operates in the shadows, which ensures that a Court never knows, nor deals with the real decision maker- Fidelity.

34 ) Because Fidelity shrouds in darkness it's role as the secret client directing mortgage

servicer law firms like Alborg, Fidelity deserves special scrutiny from this Court. Because

Fidelity keeps it's role a secret, none of the the attorney fees it causes Alborg and Holland

to collect ( both those kicked backed to it and those that the *"Network"* attorneys keep )

satisfy the disclosure requirements of Cal. R. P. Cond. 1-320 ( A ) and numerous other

legal requirements.

35 ) Furthermore, because Fidelity keeps it's role secret while exercising control over it's

*"Network"* attorneys ( Alborg and Holland ) civil RICO makes Fidelity; Alborg; and

Holland, liable for treble damages for disgorgement and reversal of all charge and fees for

this case, and for all other cases in which Fidelity received a kickback.

36 )**The "Network Agreement" Between Fidelity and "Network" Law Firms.**

When Fidelity hires law firms like Alborg to represent mortgage servicers like MERS

( Genpact ), Fidelity uses systematic, standardized, and secret retention agreements, called

*"Network Agreements"* ( See **Exhibit 1** pages 25 to 31 ) to govern how these law firms

must operate, as depicted in Figure 2 :



Figure 2: Fidelity's Law Firm *"Network"*

37 ) Using it's **"Nationwide Network "** of law firms, combined with the claims of

mortgage service companies like MERS ( Genpact ), Fidelity skims foreclosure debtors

through it's kick back scheme. Under it's **" Network Agreements "** each of Fidelity's law

firms charge a fee scale set by Fidelity for filing NODS, and for legal and litigation work,

but kickback a portion of these fees to Fidelity. ( See **Exhibit 1,** Pages 34, 35, and 36 )

Again, without Court involvement via the non judicial foreclosure system, the Court never

learns of Fidelity, let alone the kick backs it receives from it's **" Network ."** attorneys.

38 ) **Typical Examples of Kickback  Made To Fidelity By " Network " Attorneys.**

Typical examples of kickbacks paid by law firms to Fidelity can be

confirmed by examining page 34, of **Exhibit 1.** The Foreclosures Fees, and schedule of

required kickbacks are set by Fidelity. They are as follows:

A. **Freddie Mac** --Legal Fee amount set by Fidelity and charged to the debtor for one ( 1 )

hour of legal work is $500.00-- *The amount of Legal Fee kick back paid  by the*

*Attorney to to Fidelity is $125.00.*

B. **FHA**-- same as above

C .**VA** -- same as above.

D. **Fannie May**--same as above

E .**Other Loan Types** – Legal Fee amount set by fidelity and charged to debtor for one

( 1 ) hour of legal work is $500.00-- *The amount of Legal Fee kick back paid by*

*the Attorney to Fidelity is $125.00.*

**Uncontested Home Equity Judicial Foreclosures** ( bottom of page 34 ) are charged at

$1,100.00. --*The amount of kick back paid by the Attorney to Fidelity is $125.00.*

39 ) Multiple similar fraudulent, and inflated legal charges, and the standard Fidelity

1   attorney fee kickback schedules are listed on pages 34, 35, and 36 of **Exhibit 1.**

2   40 ) The amount of Fidelity's required kickbacks was revised and updated on October

3   2, 2007, whereby Fidelity demanded bigger kickbacks from **"Network Attorneys"**

4

5   ( Alborg ) That is shown by comparing the October 2, 2007 Fidelity kickback schedule,

6   ( page 36 ) with the March 27, 2002 Fidelity kickback schedule, ( page 34 ) of **Exhibit 1.**

7   41 ) The above information provides this Court with multiple valid, cognizant, legal

8   theories that support the basis of plaintiff's civil RICO complaint against defendants.

9

10

### IV.

### DEFENDANT'S MOTIONS TO DISMISS PLAINTIFF'S COMPLAINT ARE

### ILL FOUNDED AND SHOULD BE REJECTED BY THE COURT.

### RESPONSE TO ALBORG DEFENDANTS

42 ) As noted in 2 ) above, Alborg defendants, do not own the Note, nor the Mortgage. The

suddenly changed "... beneficial interest... " ( whatever than means ) in

the mortgage to Genpact from MERS is simply double talk to mask the complained of civil

RICO foreclosure fraud by Alborg defendants. Defendants must own the Note or

Mortgage in order to file a valid NOD, and Alborg defendants know it.

43 ) Plaintiffs filed a complaint in Contra Costa Superior Court ( Case No. N08-0822 ) on

May 15, 2008 against MERS, Genpact and Alborg and the other defendants. It was

amended on July 7, 2008, in response to defendants demurrer of June 17, 2008. A demurrer

to the amended complaint is *not* scheduled to be heard on August 5, 2008 as stated by

Alborg.

Defendants have mis represented the Contra Costa complaint. It does ***not*** plead a

RICO claim. Rather, the state complaint seeks punitive damages for Intentional Infliction

of Emotional Distress, which are not allowed for federal civil RICO complaints.

Defendants assertions that it doesn't understand the complaint are patently spurious. The complaint clearly states that defendants acting as an illegal enterprise violated civil RICO law by filing a fraudulent foreclosure notice, followed by defendant fraudulently asserting charges for legal fees and costs for the fraudulent foreclosure notice.

Plaintiff ( above ) has now provided even further details regarding defendants violations of civil RICO. Namely: details pertaining to  the filing of a fraudulent foreclosure notice; details pertaining to filing of fraudulent attorney fees and costs; and details pertaining to the illegal kickback legal fee scheme between Fidelity and it's Network attorneys .

Again, and noteworthy, defendants fail to address the legal consequences of  the predicate acts that defendants did not own the Note or Mortgage at the time they filed the NOD.

### V.

## OPPOSITION TO DEFENDANT'S LEGAL ARGUMENT

## SUFFICIENCY OF COMPLAINT Fed. R. Civ. P. 12 ( b ) ( 6 )

## STANDARD OF REVIEW.

**44 ) Opposition to the allegation that the "Complaint Fails to Plead Facts Sufficient to State A Cognizable Legal Theory Against Defendants."**

Although defendants initially acknowledge that a Motion to Dismiss is only for a test of the sufficiency of the complaint, and not to decide the merits of the case, Alborg defendants however, then repeatedly irrationally argue the merits of the case. Defendants have clearly mis-stated well settled law law, as follows:

The purpose of a Motion to Dismiss is a test of the sufficiency of the complaint, not to decide it's merits. *Nararro v. Block* 250 F3d 729 ( 9th Cir. 2001 ) In reviewing a Fed. R. Civ. P. 12 ( b ) ( 6 ) Motion, the Court accepts all allegations in the complaint as true and

13.

construes them in the most favorable light to the plaintiff. *Epstein v. Washington Energy Co.,* 83 F.3d 1136, 1140 ( 9th Cir. 1999 )

The court will **_not_** dismiss a complaint for failure to state a claim "... unless it appears beyond a doubt that plaintiff can prove no set of facts in support of his claim that would entitle him to relief. " *Conley v. Gibson* U.S. 41, 45-46 ( 1957 ).

Dismissal is only proper where there is no cognizable legal theory or an absence of sufficient facts to support a cognizable legal theory. *Navarro* 250 F 3d at 732.

45 )As shown by paragraphs 1 through 44 (above) plaintiff has provided cognizable legal theories and sufficient facts which support them.

46 ) **Opposition to the allegation that " Plaintiffs Complaint Fails To Identify Any Specific RICO Violation."**

Defendants assert  the complaint fails to identify any specific RICO violation. Not only is that in  error, it is wrong to the point of being frivolous. The complaint specifically identifies predicate acts of fraud ( a civil RICO violation ) caused by defendants filing of a false NOD without the legal right to do so, because defendants did not own the Note or Mortgage.( See  Complaint-Page 3 line 11 to page 4 line 21, and Page 7, lines 9 to 15 ) Additionally, the complaint specifically identifies further predicate acts of  fraud ( a civil RICO violation ) when defendants prepared and served the NOD with fraudulent invoicing practices that plaintiff owed  $750,000.00 and $ 137, 818.75( See page 4 line 22, to page 5 line 6, of the complaint ).

48 ) **Opposition to the allegation that "Plaintiffs Have Failed to Adequately Plead An Enterprise."**

14.

1   Civil RICO law 18 U.S.C Section 1961 ( 4 ) defines an "... enterprise ..." as follows :

2   " any individual, partnership, corporation association, or other legal entity, and any union

3   or group of individuals associated in fact, although not a legal entity."

4

5   The six ( 6 ) named defendants are all different companies. Five ( 5 ) of the six ( 6 )

6   companies are specifically identified by name and function in the fraudulent NOD.

7   The hidden sixth defendant,Genpact Mortgage Services, Inc., is not identified in the

8   NOD. Even though Genpact is _**not**_ named as the beneficiary in the NOD, ( MERS is

9

10   identified as the beneficiary-see page 2 of the NOD ) Alborg defendants  now suddenly

11   switch positions , and state that Genpact holds " beneficial interest " in the mortgage.

12   ( page 1 lines 24-25 ).

13   **Questions**: What is really going on here ? What ever happened to the Alborg defendants

14   claim  that MERS held the " beneficial interest " in the mortgage ? Why the sudden change

15

16   from MERS to Genpact? Clearly, the Alborg defendants are having a hard time  keeping

17   their fraudulent story straight. The sudden unexplained change of the alleged  " beneficial

18   interest " in the mortgage, first held by MERS, and now without explanation, changed to

19   Genpact, brings to mind the words of the great Scottish poet, Sir Walter Scott.

20

21   *" Oh what a tangled web we weave, when we first practice to deceive."*

22   The six ( 6 ) defendants are clearly associated in fact, acting jointly as a racketeering

23   enterprise, engaged in an illegal scheme, via a pattern of fraud, misrepresentation, and

24   conspiracy, using U.S. Mails and interstate Wires for their unlawful financial gain in order

25   to damage plaintiff.

26

27

49 ) **Opposition to the allegation that " Plaintiffs Have Failed to Adequately Plead a Pattern of Racketeering ."**

Defendants assert that a RICO complaint must assert at least two ( 2 ) instances of racketeering activity, and that plaintiffs have failed to do so. Defendant, however, errs. The complaint not only asserts two ( 2 ) instances of defendant's racketeering activity, ( the fraudulent NOD and the fraudulent invoicing practices) the complaint actually asserts hundreds and probably thousands of instances of racketeering activity by defendants. ( See Page 7, lines 9 to 15 of the Complaint.) Additionally, as explained above, Fidelity and it's *" Network."* attorneys  are engaged, nation wide, in thousands of ongoing of racketeering activities via illegal kickbacks of legal fees. All are civil  ROCO violations.

50 ) **Opposition to the allegation that " Plaintiffs Have Failed to Adequately Plead Mail Fraud and Wire Fraud."**

Defendants Motion at page 7, line 25, states  in pertinent part:

" Where plaintiffs allege mail and wire fraud as the basis of a RICO violation, the allegations of fraud must comport with with the Fed. R. Civ. P. 9 ( b) heightened pleading standard. *Poling v. Hovnanian Enterprises* 99 F Supp. 2D 502 ( D.N.J. 2000 )."

Plaintiff has fully met this heightened pleading standard. The complaint states with particularity the "... circumstances  of  the alleged fraud in order to place defendants on notice of the precise misconduct with which they are charged..." *Poling* supra 99 F. Supp. at 508 citing *Seville Indus. Machinery v. Southwest Machinery Corp* 742 F. 2d 786, 791, ( 3rd Circ. 1984 ) cert denied .

16.

**U.S. Mail Fraud**   Defendants served the fraudulent NOD via U.S. Certified Mail, dated May 29, 2008. The certified letter is included at Exhibit No. 2 in the complaint. Defendant was specifically notified in the complaint that using the U.S. Mails and interstate wires to serve a fraudulent NOD were predicate acts and a civil RICO violation. ( see page 3 line 24, to page 4 line 5, of the complaint.)

 **Interstate Wire Fraud**   Defendants confirm on page two ( 2 ) of the NOD, that the NOD was electronically filed in the Office of the Recorder of Contra Costa County with out a official book, or page number. Defendant was specifically notified in the complaint that using interstate wires to file a fraudulent NOD was a predicate act and a civil RICO violation.  ( See page 3 line 24, to page 4, line 5 )

Unquestionably, as shown by the above, defendants were precisely notified of the circumstances of the alleged mail and wires fraud, as required by law.

51 ) **Opposition to the allegation that " Alternatively, The Action Should be Stayed Based Upon The First -Filed State Court Action."**

 On May 15, 2008, Plaintiffs filed a complaint in State Superior Court, County of Contra Costa, against the same six ( 6 ) defendants that are sued in this complaint. In response to defendant's demurrer, the complaint was amened on July 7, 2008. Contrary to defendant, a hearing is not scheduled for August 5, 2008.

Although it is permissible to file a civil RICO complaint in state court *Tafflin v. Levitt* 493 U.S. 455 ( 1990 ) the state complaint is not a civil RICO case because the causes of action are materially different from those in the federal complaint, as is the requested relief.

The six ( 6 ) causes of action in the state complaint are: Wrongful Foreclosure; Fraud -Filing a False Foreclosure Notice; Abuse of Process;  Breach of the Covenant of Good

17.

Faith and Fair Dealing;  Fraud- False Accounting Charges; Negligent and Intentional

Infliction of Emotional Distress.

Contrary to defendants assertions, the claims, parties, and available relief significantly

differ between the two actions. For example:the state complaint requests damages for

Intentional Infliction of Emotional Distress, which is not allowed in a federal action. Also,

defendant MERS is located in the state of Virginia, and thus, MERS is not readily

available to California courts. Additionally, federal civil RICO law  mandates treble

damages, whereas, state law does not allow triple damages for fraud.

There is no prohibition against plaintiffs proceeding in both federal and state courts. If

there are any material conflicts, the Federal District Judge has the discretion to remand to

the state court " all matters in which state law predominates ." _Holland v. World Leasing_

_Inc.,_ 764 Supp 1442 ( N.D. Ala. 1991)

Also, the Supreme Court ruled that in a damages action, the Federal District Judge may

only order a stay, pending resolution of state proceedings and may not invoke abstention to

dismiss the suit altogether. _Quackenbush v. Allstate Ins., Co.,_ 517 U.S. 706 ( 1966 ).This

limitation applies to civil RICO actions seeking damages. _DeMauro v. DeMauro_ 115F 3d.

94 ( 1st. Cir. )

Even if the parties in both state and federal actions are virtually identical, if different issues

are raised and different remedies are sought ( as here ) abstention would be abuse of

discretion for the court to abstain from hearing this matter. _New Becky Mining v. United_

_Mine Workers of Am_., 946 F 2d ( 4th Cir. 1991 ) cert denied, 503 U.S. 971 ( 1992 )

( reversing abstention ) _Rycoline Products v. C& W Unlimited_ 109 F 3d. 833 ( 3rd.Cir.

1997 )

18.

The state and federal actions are not parallel. The federal complaint alleges civil

RICO violations, whereas, the the state complaint does not contain a civil RICO cause of

action. The state action seeks damages for Intentional Infliction of Emotional Distress,

whereas federal civil RICO does not allow such relief.

52 ) Plaintiffs have a constitutional right to equal protection of the laws, which right would

be violated by limiting plaintiffs free access to either the state and federal court systems.

## VI.

## CONCLUSION

This Complaint is but the tip of the iceberg of massive ongoing nationwide home

foreclosure fraud, executed by the defendants " evil empire " racketeering enterprise

comprised of six separate companies that are associated in fact( i.e. defendant title

companies, mortgage servicers, law firms, attorneys, and their agents ).

None of the defendants, including the Alborg defendants, owned the Note, or Mortgage at

the time of filing the NOD. Therefore, none of the defendants had the legal right to file a

NOD. For that reason alone the NOD should be canceled, dismissed and thrown out

pursuant to recent rulings by Federal Judges Boyko, O ' Malley, and Rose.

For the foregoing reasons, the Alborg defendants motion to dismiss should be denied.

Alternatively, if the Court finds the pleadings lacking, it is requested that the Court grant

leave to amend the Complaint

Dated _Aug/1/2008_

Respectfully submitted,

Kenneth Barker, Plaintiff In Pro Se.

19.

Exhibit 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re ERNEST HARRIS<br>and MATTIE HARRIS,<br><br>   Debtors,<br><br>ERNEST HARRIS<br>and MATTIE HARRIS, on behalf<br>of themselves<br>and all other similarly situated<br>Chapter 13 debtors,<br><br>   Plaintiffs,<br><br>vs.<br><br>FIDELITY NATIONAL INFORMATION<br>SERVICES INC. D/B/A FIDELITY<br>NATIONAL FORECLOSURE<br>& BANKRUTPCY SOLUTIONS,<br><br>   Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO. 03-44826-H4-13<br><br><br><br><br><br><br><br><br><br>ADVERSARY NO. _____ |

## COMPLAINT

Plaintiffs, Ernest Harris and his wife, Mattie Harris, individually and on behalf of all other similarly situated Chapter 13 debtors, allege as follows:

## NATURE OF THE CASE

1.  This case involves the undisclosed kickback/sharing of bankruptcy creditor attorney fees to a non-law firm corporate entity.

2.  Mortgage servicers routinely appear in this Court seeking relief from the automatic stay or in opposition to proposed chapter 13 plans. The Mortgage servicers appear through counsel who announce their appearance on behalf of those mortgage servicers.

1

3. But, unbeknownst to this Court, those counsel often answer not to the mortgage servicers on whose behalf they appear, rather these counsel answer to an undisclosed middleman such as the Defendants.

4. Defendants provide what is known in the mortgage-servicing industry as default servicing. Loans which are subject to default servicing include loans which may be subject to foreclosure and loans which are in bankruptcy.

5. Some of the services which are provided by default servicers such as the Defendants include: 1) executing documents on behalf of the original servicer; 2) ordering and providing broker price opinions; 3) track and provide fees for payoffs and refinancings, and; 4) provide centralized billing to vendors.

6. An additional function of default servicing is the identification and retention of legal services which may be necessary for any particular mortgage in default, *e.g.* noticing and posting a property for foreclosure or seeking relief from the automatic stay in a bankruptcy proceeding.

7. In managing the performance of the legal services for their mortgage servicing clients, Defendants require law firms to execute a "Network Agreement," which details the agreement for services between the Defendants and the particular law firm.

8. The claims covered in this Complaint relate to the illegal fixing of fees in the bankruptcy context and the requirement that law firms that execute the "Network Agreement" to kickback a contractual prearranged fixed portion of their attorney fees to the Defendant.

9.    In reality, the Defendants are merely middlemen who, in effect, sell the legal business of their mortgage-servicing customers, and secretly control and direct counsel who appear on behalf of those mortgage-servicer customers.

10.   For obvious reasons, these "Network Agreements," as well as the kickbacks and prearranged fixed fees which are dictated in the agreements are kept secret and the disclosure requirements of the Bankruptcy Code and Rules are ignored.

11.   Defendants' secret kickback scheme also violates the U.S. Code, which makes it a crime to knowingly and fraudulently agree to fix fees in a bankruptcy proceeding.

12.   The Harrises and the Plaintiff Class seek relief from this Court to remedy these violations.

## JURISDICTION AND VENUE

13.   This action arises out of Sections 105, 362(k), and 506(b) of the Bankruptcy Code, 11 U.S.C. §§ 105, 362(k), and 506(b), as well as Bankruptcy Rule 2016.

14.   The Bankruptcy Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1334 and under the Order of Reference of bankruptcy cases and proceedings under 28 U.S.C. § 157.

15.   This is a core proceeding under 28 U.S.C. §§ 157 (a)(2)(A), (B), (K), and (O). This adversary proceeding relates to the Chapter 13 case, *In Re Harris*, Case No. 03-44826-H4-13, In the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

## PARTIES

16.   Plaintiffs Ernest Harris and Mattie Harris are Chapter 13 debtors whose bankruptcy proceeding is pending in this Court. The Harrises assert the claims herein individually

3

and on behalf of a class of similarly situated Chapter 13 debtors who have been subject to the collection activities of the Defendants, their mortgage servicing customers and their stable of "network attorneys."

17. Defendant Fidelity National Information Services, Inc. is a Delaware corporation with its principal place of business at 601 Riverside Avenue, Jacksonville, Florida 32204-2901. Fidelity does not appear to maintain a registered agent for service of process in Texas, despite its specific contacts with Texas businesses and individuals related to this case and systematic and continuous contacts with Texas to boot. Fidelity can be served through its registered agent for service of process, Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

18. Defendant Fidelity National Foreclosure Solutions, Inc. (f/k/a Fidelity National Foreclosure & Bankruptcy Solutions), is a Delaware corporation with its principal place of business at 1270 Northland Drive, Suite 200, Mendota Heights, Minnesota 55120. Fidelity National Foreclosure Solutions, Inc. can be served through its registered agent for service of process, the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

## FIDELITY: SECRET PUPPETMASTER OF CREDITORS' LAWYERS

19. Mortgage servicing companies such as Saxon Mortgage Services, Inc. ("Saxon") (the mortgage-servicing company that appeared in the Harrises' Chapter 13) and many others routinely appear in this court as creditors in Chapter 13 bankruptcies.

20. Fidelity acts as a secret middleman between many of these mortgage companies and the law firms that appear on behalf of the mortgage servicers. According to its

Executive Chairman, Fidelity's "Lender Processing Services" provides "comprehensive data, servicing, and technology solutions to large-scale mortgage servicing lenders."

21.    In fact, Fidelity's "comprehensive" role is really that of secret puppetmaster of the law firms that appear in this Court on behalf of mortgage servicing lenders. These law firms (in the Harrises' case, Mann & Stevens, P.C.) collect their fees by tendering their bills through Fidelity and then on to the mortgage servicer – in this case Saxon, which then charge debtors, like the Harrises, without ever obtaining this Court's approval.

22.    Saxon either obtains cash payments of these fees or adds the indebtedness to debtor accounts. The debtors often only become aware of this years later, typically when they sell their home or refinance, only to discover an extra few hundred or thousand dollars required to release this lien.

23.    In the Harrises proceeding, Saxon, through Fidelity, charged the Harrises both in cash and by adding to their indebtedness.

24.    The fees the Fidelity-controlled law firms charge in Chapter 13 bankruptcies are inflated by 25% to 50%. The law firms, like Mann & Stevens, P.C., kick back the extra to Fidelity as part of Fidelity's nationwide "Network Agreement" governing its relationships with these law firms. Again, Fidelity keeps its role, as well as the kickback, hidden from the courts as a matter of systematic policy.

25.    Fidelity's conduct is criminal under 18 U.S.C. § 155, which provides that any party in interest commits a crime when that entity or its representative "knowingly and fraudulently enters into an agreement" for the purpose of fixing the fees or other

compensation to be paid to any party in interest or to any attorney for any party in interest for services rendered in connection therewith, from the assets of the estate." Under section 155, this conduct is punishable by both fines and prison time.

26. Fidelity's conduct places its "Network" attorneys in violation of multiple ethical rules forbidding fee-splitting. For example, the State Bar Rules provide that "[a] lawyer . . . shall not share or promise to share legal fees with a nonlawyer," with exceptions inapplicable here. *See* Tex. R. Prof. Cond. 5.04(a).

27. Fidelity's "Network Agreements" with its "Network" attorneys reflect Fidelity's systematic participation in a fee-splitting scheme that occurs routinely in Court cases but without this Court's knowledge.

28. In addition to the criminal and ethical prohibitions against fee-splitting, the Bankruptcy Code and Bankruptcy Rules impose additional restrictions on the charging of attorneys' fees. As this Court has concluded, Rule 2016's requirement of disclosure of fees "goes hand in glove with the overall purposes of § 506(b) – to protect estate assets from excessive fees charged by oversecured creditors and their overzealous attorneys." *Sanchez v. Ameriquest, (In re Sanchez)*, 372 B.R. 289, 304 (Bankr. S.D. Tex 2007) (citations omitted)

29. Rule 2016 specifically requires disclosure of fee-splitting arrangements like this. However, Fidelity deliberately keeps its fee-generation and kickback scheme (and its role as puppetmaster of creditors' lawyers) secret, thereby rendering all fees collected in connection therewith *per se* unreasonable.

30. Fidelity's role as secret puppetmaster over creditor law firms like Mann & Stevens renders Fidelity jointly and severally liable for **all** these fees under the law of civil conspiracy.

## FIDELITY'S SECRET DEALS WITH MORTGAGE COMPANIES AND LAW FIRMS

31. Fidelity uses two sets of agreements in its systematic secret kickback scam: its "Default Services Agreement" with mortgage servicers like Saxon, and its "Network Agreement" with its law firms like Mann & Stevens.

32. ***The Default Services Agreement***. First, Fidelity obtains its "Default Services Agreements" with various mortgage servicing companies. Figure 1 below illustrates these relationships:



Figure 1: Fidelity's "Default Services Agreements" with Mortgage Companies

33. Under the "Default Services Agreement," mortgage servicers cede control over their accounting and legal affairs, and the hiring of the lawyers who appear on their behalf, to Fidelity.

34. Fidelity obtains the right and power to choose and manage and set the fees for the law firms that will appear on behalf of the mortgage servicing company.

35. Fidelity and each mortgage servicer signatory to the Default Services Agreement agree to keep the terms of the agreement secret.

36. Again, Fidelity never appears as a party. Thus, when mortgage servicers like Saxon appear in this Court, their lawyers act at the behest of their secret puppetmaster, Fidelity, about whose role this Court knows little or nothing.

37. Fidelity's operation in the shadows ensures that this Court never deals with the real decision maker – Fidelity.

38. Because Fidelity shrouds in darkness its role as the secret client directing mortgage servicer law firms like Mann & Stevens, Fidelity deserves special scrutiny from this Court. And because Fidelity keeps its role a secret, **none** of the attorney's fees it causes Saxon to collect (both those kicked back to it and those that "Network" attorneys keep) satisfy the disclosure or approval requirements of Rule 2016 and this Court.

39. Moreover, because Fidelity keeps its role a secret while **exercising control** over its "Network" attorneys such as Mann & Stevens, the law of civil conspiracy makes Fidelity liable for disgorgement and/or reversal of charges of **all** fees in which Fidelity received a kickback.

40. ***The "Network Agreement" Between Fidelity and "Network" Law Firms***. When Fidelity hires law firms like Mann & Stevens to represent mortgage servicers like Saxon, Fidelity uses systematic, standardized, and secret retention agreements, called "Network Agreements," to govern how those firms will represent Saxon (again, with Fidelity in the shadows), as depicted in Figure 2:



Figure 2: Fidelity's Law Firm "Network"

41. Using this "nationwide network" of law firms, combined with the claims of mortgage service companies like Saxon, Fidelity skims bankrupt debtors through its kickback scheme. Under its "Network Agreements," each of Fidelity's "Network" law firms charges fees for litigating claims against Chapter 13 debtors, but kicks back a portion of those fees to Fidelity. Again, this Court never learns of Fidelity, let alone the kickbacks.

**THE HARRISES – FIDELITY'S SCHEME IN ACTION**

42. The Bankruptcy Code forbids creditors like Fidelity/Saxon from collecting post-petition attorneys' fees without full disclosure and scrutiny. But the secret kickbacks of attorneys' fees to the well-hidden Fidelity presents violations far worse than the garden-variety scams that this Court has begun to address in the past few months.

**Fidelity/Saxon's Objection to Harrises' Plan:**
**$200 in Attorneys' Fees, $50 Kicked Back to Fidelity**

43.     Creditor objections to debtors' proposed Chapter 13 plans provides an opportunity for
        Fidelity to skim money from debtors in many cases.  For example, in the Harrises'
        case, in December 2003, Fidelity (acting through Saxon and Mann & Stevens) filed
        an objection to the Harrises' Chapter 13 plan before the plan was confirmed.

44.     Mann & Stevens charged Saxon $200 for this work, pursuant to Fidelity's "Network
        Agreement."

45.     Saxon paid Mann & Stevens the $200.00 attorney fee, charged the Harrises $200.00
        and then, under the "Network Agreement," Mann & Stevens kicked back $50 of that
        fee to Fidelity – secretly, outside the detection of this Court.

46.     Fidelity kept this kickback secret because it knew full well that this Court, the
        Bankruptcy Code and the Federal Rules of Bankruptcy Procedure forbids that
        practice.

47.     The addition of the full $200.00 to the Harrises' mortgage account had the effect of
        (1) increasing the debt of the Harrises and of their bankruptcy estate, and (2)
        increasing the amount of estate property necessary for the Harrises to enjoy a true
        fresh start through their bankruptcy proceeding.  In this way, the Harrises and other
        debtors have little inkling that, upon a refinancing or a sale, the mortgage company
        will tell them that they have to pay hundreds or thousands more to release their lien,
        or that upon receiving their discharge that they will be liable for those amounts in
        order to have a current mortgage.

**Fidelity/Saxon's Motion for Relief from Stay:**
**$650 in Attorneys' Fees, $150 Kicked Back to Fidelity**

48.    Another example of Fidelity's fee-splitting occurs when Fidelity files, again through its "Network Attorneys" and mortgage servicing companies like Saxon, motions for relief for automatic stay in which Fidelity/mortgage servicing co. allege the debtor missed payments, failed to carry insurance on a home, or committed other acts of default.

49.    Again, that is what happened with the Harrises. Fidelity/Saxon and Fidelity's "Network" law firm of Mann & Stevens, filed a motion for relief from the automatic stay against the Harrises in April 2004.

50.    On information and belief, Saxon paid Mann & Stevens $650 in fees for this work. Fidelity/Saxon charged the Harrises for these fees and collected these fees in six monthly installments of $148.55 (charging interest for the extra time) pursuant to an Agreed Order.

51.    However, under the "Network Agreement," Mann & Stevens secretly kicked back $150 of that fee to Fidelity.

52.    The $650.00 was disclosed and was contained in the Agreed Order, but neither Saxon nor Mann & Stevens ever disclosed the $150.00 kick-back to Fidelity.

### CLASSWIDE INJUNCTIVE RELIEF AND
### CORRESPONDING DECLARATORY AND EQUITABLE RELIEF
### (CREDIT, REFUND, AND DISGORGEMENT)

53.    Multiplying the amounts the Harrises paid times thousands of debtors, it amounts to hundreds of thousands (if not millions) of dollars for conduct that perniciously undermines this Court's jurisdiction and the integrity of the bankruptcy system.

54. The individual charges are small in principal, but extremely large when viewed within all the chapter 13 proceedings in the Southern District of Texas.

55. Indeed, this problem – Fidelity's express and systematic receipt of kickbacks and secret control of law firms who appear before this Court as representing others – presents an ongoing assault on the Harrises, the class, and this Court's jurisdiction for which no adequate remedy at law exists.

56. The Harrises and the plaintiff class are entitled to an equitable decree enjoining Fidelity from making any further efforts to collect fees with kickbacks, as well as corresponding declaratory and equitable relief (i) reversing the existing charges that remain on the Harrises account, and (ii) disgorging the monies Fidelity has already collected from them.

57. This decree is central to remedying Fidelity's conduct, both as to the Harrises and to the class.

58. This Court can easily oversee Fidelity's accounting and computation of this relief by means of objective data from Fidelity's own records. The tabulation will follow the format below:

| Debtor | Injunction | Declaration reversing charges | Declaration/equitable relief disgorging fees collected |
|---|---|---|---|
| Chapter 13 Debtors Ernest and Mattie Harris | Uniform and classwide relief from Fidelity's continued systematic practice of collecting fees with kickbacks | $200 plus interest for fees that Fidelity placed on Harrises' account* | $819.13 plus interest for fees Harrises paid* |
| Chapter 13 Debtor John Doe | Uniform and classwide relief from Fidelity's continued systematic practice of collecting fees with kickbacks | $___ (per Fidelity's database) for fees that Fidelity placed on debtor John Doe's account | $___ (per Fidelity's database) for fees paid |
| Chapter 13 | Uniform and | $___ (per Fidelity's database) | $___ (per Fidelity's database) |

| Debtor Jane Doe | classwide relief from Fidelity's continued systematic practice of collecting fees with kickbacks | for fees that Fidelity placed on debtor Jane Doe's account | for fees paid |
|---|---|---|---|
| Chapter 13 Debtor John Smith | Uniform and classwide relief from Fidelity's continued systematic practice of collecting fees with kickbacks | $___ (per Fidelity's database) for fees that Fidelity placed on debtor John Smith's account | $___ (per Fidelity's database) for fees paid |
| … | … | … | |
| **TOTAL** | Uniform and classwide relief from Fidelity's continued systematic practice of collecting fees with kickbacks | $___ (per Fidelity's database) for fees that Fidelity placed on debtors' accounts | $___ (per Fidelity's database) for fees paid |

*Based on Mann & Stevens's invoices

59. Fidelity has a sophisticated data-management system that makes computing the relief simple. This Court can and should remedy Fidelity's misconduct by use of the same classwide tools with which Fidelity carried it out.

## CLASS ALLEGATIONS

60. Plaintiffs bring this action individually and on behalf of all others similarly situated as members of a proposed plaintiff class pursuant to Fed. R. Bankr. P. 7023.

61. The class that plaintiffs seek to represent consists of all Chapter 13 debtors in the Southern District of Texas who are (a) presently subject to any claim of any kind by Fidelity, Fidelity's clients, and/or Fidelity's Local Counsel/"Network" Attorneys and (b) against whom Fidelity and its Network Attorneys have kicked back attorneys' fee payments from attorneys pursuant to Fidelity's Network Agreements.

62. This action may be properly maintained as a class action pursuant to Fed. R. Bankr. P. 7023.

63. The members of the class are so numerous that joinder of their individual claims is impracticable. The precise number of class members and their addresses are presently unknown to plaintiffs but are easily obtained from Fidelity's systematically maintained "Fidelity Software," under which Fidelity tracks its "Network" attorneys' activities.

64. Class members can be notified of the pendency of this action by publication in newspapers, by mailed notice, and by other means.

65. Fidelity intentionally operates its "Network" attorney fee-collection and fee-kickback scheme on a systematic, class-wide basis.

66. Fidelity used systematic recordkeeping software, policies, and procedures to effectuate its secret and illegal scheme of collecting attorneys' fees without court approval and receiving systematically calculated kickbacks of those fees, again without court approval and with knowledge that no court would ever tolerate Fidelity's practice.

67. Therefore, common questions of law and fact exist as to all members of the class. These common questions predominate over questions affecting only individual class members.

68. The Harrises' claims are typical of the claims of the members of the class they seek to represent.

69. The Harrises and the class members are Chapter 13 debtors in whose bankruptcy proceedings Fidelity hired "Network" attorneys to appear on behalf of mortgage servicers asserting claims against the debtor class.

70. Fidelity used the same secret fee-collection and fee-splitting/kickback scheme against the Harrises and the class members on a systematic basis.

71. The Harrises adequately represent the class.

72. Their interests do not conflict with the interests of the class members they seek to represent.

73. Plaintiffs have retained counsel who are competent and experienced in complex class action and bankruptcy litigation.

74. The Harrises are committed to seeking a classwide injunction, with corresponding classwide declaratory and equitable relief, because any mere monetary recovery on their existing claims would do nothing to stop Fidelity from committing the same violations in the future against them and the rest of the class.

75. The Harrises understand from their own experience that debtors like themselves are highly vulnerable and depend upon the integrity of the bankruptcy courts to help them preserve what precious little they have. Nothing short of classwide injunctive relief will work.

76. Finally, the Harrises and their counsel intend to prosecute this action vigorously.

77. The interests of the members of the class will be fairly and adequately protected by plaintiffs and their counsel.

78. The interests of the Harrises are coincident with, and not antagonistic to, those of the class members. Without representatives like the Harrises, Fidelity would continue to undermine and subvert this Court's jurisdiction and mulct Chapter 13 debtors in willful defiance of the law.

79. The class action device is far superior to other available means for the fair and efficient adjudication of the claims of plaintiffs and of the class.

80. Judicial management of this litigation is essential because of the pernicious and secretive conduct of Fidelity in Chapter 13 bankruptcies that jeopardizes, on a systematic basis, the integrity of the bankruptcy process and this Court's jurisdiction.

81. This class action is the only method by which all of the class members' common claims can economically and expeditiously be adjudicated in one proceeding and thereby preclude the possibility of multiple trials and inconsistent judgments throughout this District.

## COUNT 1

### VIOLATION OF BANKRUPTCY CODE § 506(b)
### (INJUNCTIVE RELIEF UNDER BANKRUPTCY CODE § 105(a) AND
### CORRESPONDING DECLARATORY AND EQUITABLE RELIEF)

82. The Harrises incorporate the allegations set forth above as if set forth in full herein.

83. Fidelity's secret fee-splitting arrangement with its Network Attorneys constitutes a violation of Bankruptcy Code § 506(b).

84. Section 506(b) specifically limits creditors to charging only "reasonable" fees, costs, or charges in Chapter 13 bankruptcies.

85. In systematically charging fees from which secret kickbacks are paid, Fidelity has committed a *per se* violation of § 506(b).

86. Fidelity not only failed to apply for the fees it charged and received from plaintiffs, it never even appeared in plaintiffs' bankruptcy.

87. This pattern of secrecy is systematic and codified in Fidelity's own agreements with its Client/Mortgage Servicing Lenders and its "Network" attorneys.

88. Pursuant to 11 U.S.C. §§ 105 and 506(b), the Harrises and the plaintiffs class they represent seek an equitable decree from this Court that enjoins Fidelity from continuing its illegal collection of fee-splitting charges in violation of section 506(b) and corresponding declaratory and equitable relief (i) reversing all attorneys' fees charged that contain a kickback and (ii) refunding and disgorging any such fees (and interest thereon) that Fidelity has already collected.

## COUNT 2

### VIOLATION OF RULE 2016(a)
### (INJUNCTIVE RELIEF UNDER BANKRUPTCY CODE § 105(a) AND CORRESPONDING DECLARATORY AND EQUITABLE RELIEF)

89. The Harrises incorporate the allegations set forth above as if set forth in full herein.

90. Fidelity's secret receipt of fees from its Network Attorneys constitutes a violation of Fed. R. Bankr. P. 2016(a).

91. Rule 2016(a) specifically requires creditors seeking reimbursement of expenses to disclose "agreement[s]" or "understanding[s]" regarding "sharing of compensation received or to be received for services rendered in or in connection with the case, and the particulars of any sharing of compensation or agreement or understanding therefor."

92. Fidelity violates Rule 2016(a) systematically and as a matter of corporate policy; it is codified in Fidelity's own agreements with its Client/Mortgage Servicers and its "Network Attorneys," as well as in the policies, procedures, software, and management structure by which Fidelity executes its secret fee-collection, fee-splitting/kickback scheme.

93. In case after case, Fidelity fails to apply for the fees it collects, fails to disclose its fee-splitting arrangement with the lawyers it controls, and conceals its very existence from this Court, again as a matter of corporate policy.

94. Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 2016(a), the Harrises and the plaintiffs class they represent seek an equitable decree from this Court that enjoins Fidelity from continuing its illegal collection of fee-splitting charges in violation of Rule 2016(a) and corresponding declaratory and equitable relief (i) reversing all attorneys' fees charged that contain a kickback and (ii) refunding and disgorging any such fees (and interest thereon) that Fidelity has already collected.

## COUNT 3

### BREACH OF CONTRACT
### (WITH INJUNCTIVE RELIEF UNDER BANKRUPTCY CODE § 105(a) AND CORRESPONDING DECLARATORY AND EQUITABLE RELIEF)

95. The Harrises incorporate the allegations set forth above as if set forth in full herein.

96. A confirmed plan constitutes a new contract between the debtor and creditors. Creditors are limited to those rights that they are afforded under the plan, which means they may not take actions inconsistent with the method of payment under the plan.

97. After plan confirmation, Fidelity's secret receipt of fees from its Network Attorneys constitutes a breach of contract.

98. The Harrises and the plaintiffs class they represent seek an equitable decree from this Court that enjoins Fidelity from continuing its illegal collection of fee-splitting charges in breach of confirmed plans of every Chapter 13 debtor in whose bankruptcies Fidelity's "Network" attorneys appear, and corresponding declaratory

and equitable relief (i) reversing all attorneys' fees charged that contain a kickback and (ii) refunding and disgorging any such fees (and interest thereon) that Fidelity has already collected.

99. The Harrises and the plaintiff class are also entitled under §38.001 of the Texas Civil Practice & Remedies Code to their attorneys' fees their counsel have incurred in investigation and prosecution of Fidelity's scheme, the truth of which Fidelity has hidden in its secret arrangements with mortgage lenders/services like Saxon.

## COUNT 4

### VIOLATION OF AUTOMATIC STAY
### (WITH INJUNCTIVE RELIEF UNDER BANKRUPTCY CODE § 105(a) AND
### CORRESPONDING DECLARATORY AND EQUITABLE RELIEF)

100. The Harrises incorporate the allegations set forth above as if set forth in full herein.

101. Under 11 U.S.C. § 362(a)(3), creditors are forbidden from engaging in any act to obtain property of the estate.

102. Fidelity's secret and illegal fee-collecting and fee-splitting/kickback scheme and participation in collection of all undisclosed and unapproved fees constitute systematic acts to obtain property of the estate of each Chapter 13 debtor in the class.

103. Based on the violations of the automatic stay, the Harrises and the plaintiff class they represent seek an equitable decree from this Court that enjoins Fidelity from continuing its illegal fee-splitting practices in violation of 11 U.S.C. § 362(a)(3), and corresponding declaratory and equitable relief (i) reversing all attorneys' fees charged that contain a kickback and (ii) refunding and disgorging any such fees (and interest thereon) that Fidelity has already collected.

19

104. Under 11 U.S.C. 362(h)[1], the Harrises and the plaintiff class action are also entitled to their attorneys' fees and costs their counsel have incurred in the investigation and prosecution of Fidelity's willful and willfully concealed classwide violation of the automatic stay.

105. Because this case involves Fidelity's systematically hidden, knowing and willful conduct in deliberate and flagrant violation of the Bankruptcy Code, Bankruptcy Rules, and the Federal criminal and State Bar ethical prohibitions against fee-splitting, Fidelity's conduct warrants the imposition of punitive damages on the amount of at least three times the other monetary relief this Court awards the plaintiff class and its counsel, as provided under 11 U.S.C. 362(h).

## COUNT 5

## CIVIL CONSPIRACY

106. The Harrises incorporate the allegations set forth above as if set forth in full herein.

107. Fidelity and its mortgage-servicer clients such as Saxon and its "Network" attorney such as Mann & Stevens have knowledge of, have agreed to, and have intended a common objective and course of action of reaping secret fees from debtors that has resulted in systematic monetary injury to debtors such as the Harrises.

108. On information and belief, the conspiracy continues to this day.

109. Fidelity knows that each time Saxon or another of its mortgage-servicer clients charges debtors' accounts for attorney's fees with a contractual kickback to Fidelity,

---

[1] This complaint refers to § 362(h) because that provision applies to the Harrises' Chapter 13 proceeding, filed in 2003, before Congress corrected the Bankruptcy Abuse and Consumer Protection Act of 2005 ("the Reform Act"), which addressed § 362 so that old § 362(h) becomes § 362(k). However, the Reform Act provides, with immaterial exceptions, that it "shall not apply with respect to cases commenced under title 11, United States Code, before the effective date of this Act." *See, e.g., In re McKinney,* 457 F.3d 623, 624 (7th Cir. 2006).

that charge is false, wrongful, and forbidden under the Bankruptcy Code, Bankruptcy Rules, State Bar Rules, and Federal criminal code.

110.    Fidelity systematically conceals all these fees – both the portions of fees that Fidelity's "Network Attorneys" kickback to Fidelity as well as the fees that Fidelity permits its "Network Attorneys" to keep – from the Court.

111.    Fidelity, through its "Network Agreements" and "Default Services Agreements," undertakes central acts in furtherance of its conspiracy through, among other things, (1) hiding behind the identity of its mortgage-company clients like Saxon, and using Saxon's name, in charging these fees; and (2) using systematic policies governing its "Network" attorneys like Mann & Stevens as puppets with which Fidelity can create this massive revenue stream, disguised as fees.

112.    Fidelity knows that the source of this secret revenue stream comes from the Chapter 13 debtors during the bankruptcy proceedings over which this Court maintains exclusive jurisdiction.

113.    Fidelity knows that debtors like the Harrises shoulder these burdens wholly ignorant of Fidelity's secret scheme.  Fidelity knows that it and its mortgage-servicer clients generate this fee revenue free from the scrutiny of this Court.

114.    Fidelity knows that this Court would never permit a creditor to generate attorney-fee revenue let alone pay kickbacks dictated by Fidelity to its "Network" attorneys – in such flagrant violation of the law.

115.    Because Fidelity's active and central role in the civil conspiracy to collect these fees, this Court's decree should hold Fidelity jointly and severally liable for all fees that the Harrises and the class have paid to Mann & Stevens and the other puppet-like

"Network" attorneys who purport to represent mortgage lenders while Fidelity secretly pulls their strings.

## COUNT 6

### PUNITIVE DAMAGES

116. The Harrises incorporate the allegations set forth above as if set forth in full herein.

117. Fidelity is liable to the debtor class for punitive damages under § 362(h) because it acted in bad faith and/or with actual knowledge that it was violating a federally protected right or with reckless disregard of whether it was doing so.

118. The award for punitive damage in this case must be adequately large to reflect two important goals.

119. The Court's award of punitive damages must reflect the reprehensible nature of Fidelity's conduct in its flagrant violation of the Bankruptcy Code and Rules, the Federal criminal prohibitions on fee-splitting in bankruptcies, and the Texas Rules of Professional Conduct forbidding fee-splitting.

120. The Court's award of punitive damages must also reflect the significant societal interest in preventing Fidelity and other similarly-situated creditors from engaging in this kind of criminal and unethical conduct in future bankruptcies.

### Prayer for Relief

121. Based on the foregoing, the Harrises and the plaintiff class pray that this matter be called to trial and, upon the presentation of its evidence, the Court award against Fidelity:

    a. An equitable decree from this Court that enjoins Fidelity from continuing its illegal fee-splitting practices;

b.  Corresponding declaratory and equitable relief (i) reversing all attorneys' fees charged that contain a kickback and (ii) refunding and disgorging any such fees (and interest thereon) that Fidelity has already collected from them;

c.  Attorneys' fees and costs that the Harrises' counsel have incurred in the investigation and prosecution of this matter;

d.  Prejudgment and postjudgment interest as allowed by law; and

e.  Punitive damages of no less than three times the value of the reversed charges, interest, and refunds, reimbursements, and disgorgement awarded to the Harrises and the plaintiff class.

Dated this 16th day of January, 2008.

Respectfully submitted,

By: /s/ Johnie Patterson
Johnie Patterson
attorney-in-charge
SBN 15601700
Michael G. Walker
SBN 20717580
Miriam Goott
SBN 24048846

OF COUNSEL:
WALKER & PATTERSON, P.C.
P.O. Box 61301
Houston, TX 77208
(713) 956-5577 (telephone)
(713) 957-3358 (fax)
jjp@walkerandpatterson.com
mwalker@walkerandpatterson.com
mgoott@walkerandpatterson.com

By: /s/ David K. Bissinger
David K. Bissinger
State Bar No. 00790311
Gerald S. Siegmyer
State Bar No. 18343300

OF COUNSEL:
SIEGMYER, OSHMAN & BISSINGER LLP
2777 Allen Parkway, 10th Floor
Houston, Texas 77019
(713) 524-8811 (Telephone)
(713) 524-4102 (Facsimile)
dbissinger@bizlawhouston.com
gsiegmyer@bizlawhouston.com

**ATTORNEYS FOR PLAINTIFFS**

## NETWORK AGREEMENT

**THIS NETWORK AGREEMENT** ("Agreement") is made between Fidelity National Foreclosure & Bankruptcy Solutions, a division of Fidelity National Title Company, a Delaware corporation ("Fidelity") and Mann & Stevens, P.C. (the "Firm") (collectively the "Parties").

**WHEREAS**, the Firm wishes to provide to Fidelity and its Clients various legal services that may include matters related to mortgage foreclosures and bankruptcies, as well as other loan default services in Texas (the "Jurisdiction");

**WHEREAS**, Fidelity wishes to provide the Firm various administrative services related to mortgage foreclosures, bankruptcies, and other loan default services; and

**WHEREAS**, each Party wishes to provide these services to the other on the terms and conditions set forth below;

**NOW, THEREFORE**, the Parties agree as follows:

**Section 1.**    **Services.**    During the term of this Agreement (the "Services Period"), each Party shall provide the other with the services set forth in Exhibit A ("the "Services"). The Parties agree to use their best efforts to provide Services in a timely and professional manner. The Parties may periodically agree in writing to add or delete Services listed in Exhibit A. When Services are added, they shall become "Services" for purposes of this Agreement. All Services provided by the Firm shall be in accordance with applicable security instrument(s), as well as federal, state and local laws and practice. The Firm is responsible for identifying any actual or potential conflict of interest during the term of representation. If the Firm does not perform according to the terms outlined below, Fidelity reserves the right to immediately remove existing files from the Firm in accordance with Section 15 below and discontinue referring new files or other legal matters to the Firm.

**Section 2.**    **Referrals.**    The Firm acknowledges that Fidelity has the right to enter into Network Agreements with other law firms at any time. Fidelity may decide which default matters are to be referred to the Firm ("Referrals") and is not obligated to make a minimum number of Referrals to the Firm. By accepting Referrals, the Firm agrees to the terms of this Agreement and waives any right to assert attorney liens or similar charging liens for payment of services or otherwise against such files. However, the Firm shall be entitled to invoice for the services rendered to date on the file(s) and costs. If Fidelity and/or the Client subsequently terminates an individual referral, the transfer provisions of Section 15 below shall apply.

**Section 3.**    **Fees.**

(a)    The fees for Services performed are set forth in Exhibit B, Exhibit C, and Exhibit D (the "Fees"). These Fees are based upon governmental, quasi-

**Saxon 0191**

governmental agency, or contractual guidelines as of September 1, 2001. The Parties may mutually agree in writing to amend Exhibits B, C and D. Except as specifically provided in Exhibits B, C and D, all Services shall be performed for flat Fees. If FNMA, FHLMC, FHA, and/or the VA revise their fee guidelines, or a contract is revised, the revised fee guidelines shall become "Fees" for purposes of this Agreement and shall apply to all Referrals on or after the effective date of the revised fee guidelines.

(b)    If Exhibits B, C, or D provide for the conversion to an hourly fee, with the exception noted in 3(c) below, such conversion may occur only after Fidelity or the client has given prior written approval.

(c)    The Firm may convert to an hourly fee when, in its discretion, it determines that there is a strong likelihood that Fidelity and/or the Client will suffer irreversible loss if immediate action is not taken. If the Firm makes such a determination, it shall seek Fidelity's approval for the conversion within one business day. If Fidelity does not respond in a timely manner, the Firm may contact the client. If Fidelity denies approval, the Firm is nevertheless entitled to bill the emergency work completed to that point on an hourly fee basis.

(d)    The Firm recognizes that interest and expenses accrue daily on each Referral. Any reasonable penalties assessed by the Client pursuant to governmental penalties for delays resulting solely from the Firm's actions or inaction will be paid by the Firm. Without limiting any other provisions of the Agreement, this provision, together with Section 15 below, shall survive termination of the Agreement by either Party.

**Section 4.    Expenses.** The Firm agrees to advance all fees necessary to meet the costs and expenses required in handling the matters assigned. The Firm agrees that expenses for telephone calls, express or certified mail, postage, copying, faxing, courier charges, electronic research (Lexis, WestLaw, etc.), PACER and/or Banko charges, travel time and related expenses, and mileage are not reimbursable unless required by law, case law or approved by the Client. If any of these charges are required by statute, the Firm shall so indicate.

**Section 5.    Payment for Services.** All invoices for services and costs are to be submitted electronically by the Firm via the NewInvoice invoice processing system, or such other electronic invoice processing system required by the Client. The Firm will be paid on its invoices directly by the Client. In no event shall Fidelity be deemed to be a guarantor of, or otherwise responsible for, any obligation of the Client. Within the thirty (30) days following each Referral, the Firm will be invoiced separately by Fidelity for the administrative fees set forth in Exhibits B, C and D. Said invoices shall be due and payable within thirty (30) days of receipt by the Firm. In the event the Client does not pay an invoice generated by the Firm due to an negligence or an error of Fidelity, the Firm shall not be required to pay Fidelity on its invoice on that referral.

**Section 6.    Insurance.** The Firm agrees to maintain in full force and effect a Professional Liability Policy. The minimum amount of coverage shall not be less than One Million Dollars ($1,000,000.00) per occurrence. The Firm shall provide proof of insurance to Fidelity on an annual basis and at such other times as may reasonably be requested. The Firm shall immediately notify Fidelity in writing of any changes in coverage, or impending termination, expiration, or lapse of Insurance.

**Section 7.    Representation of Client.** For purposes of this Agreement, Fidelity's servicer/investor clients (the "Client") shall be considered the mutual clients of both Fidelity and the Firm. Fidelity shall be considered the agent of each servicer/investor Client. The Firm will never be prohibited from directly contacting any Client where, in the professional opinion of the Firm, such contact is necessary. Whenever possible, the Firm shall order title from Fidelity National Title/Chicago Title/Alamo Title/Ticor Title/Security Union Title.

**Section 8.    Communication Between Parties.**

(a)    General Communication. The Firm shall update AMOS web or Lenstar, when applicable. The Firm shall provide written or electronic status reports on Referrals as reasonably required by Fidelity. The Firm shall respond to all written or oral requests from Fidelity Account Representatives within one business day. Likewise, Fidelity shall respond to all written or oral requests from Firm employees within one business day. Fidelity reserves the rights and remedies available at law or in equity for the Firm's failure to perform any of its obligations hereunder.

(b)    Updates. Fidelity shall periodically provide the Firm policy and procedure changes in the form of a Fidelity Network Update ("Update"). The Update shall be sent to the Firm either by facsimile or electronic mail. The Update shall be sent to the facsimile number or e-mail addresses noted in the Notice Section below. The Firm agrees to incorporate these Updates with the existing policies and procedures. The terms of any Update shall apply to the Parties as of the effective date indicated in the Update. The Firm takes full responsibility for disseminating the information to its staff. The Firm shall promptly bring to the attention of Fidelity any issue, claim or dispute which may have important legal, public relations or policy implications for the Client.

**Section 9.    Annual Information.** The Firm shall provide Fidelity with the following information on an annual basis: (a) Firm resume; (b) a list of all personnel working on Referrals, along with each individual's title; (c) a list of the status of all attorneys and professionals with the Firm, including bar registrations, and any disciplinary notices or proceedings; and (d) a letter certifying that the statements in Section 12(i) and (ii) are correct.

**Section 10.    Complete Information.** Fidelity shall fully cooperate with the Firm and make a good faith effort to promptly provide the Firm with all relevant

Saxon 0193

information on each Referral. The Firm will review the information provided to ensure that it is sufficient to process each Referral. If the Firm believes that the information is incomplete, the Firm will immediately request the missing information from Fidelity. A referral from Fidelity shall not be considered complete until all missing information is received from Fidelity or the Client

Section 11. **Confidentiality.** Privileged information supplied to the Firm by Fidelity shall be kept confidential in accordance with applicable rules of professional conduct. Notwithstanding anything in this Agreement to the contrary, the Firm shall comply with all privacy and data protection laws, rules, and regulations which are or which may in the future be applicable to the Services. The Firm agrees that it will keep confidential and will not use nor disclose to any other party any nonpublic personal information which it receives from or on behalf of the Client in connection with providing Services under this Agreement, except to perform Services under this Agreement. The term "nonpublic personal information" shall have the meanings set forth in Section 509 of the Gramm-Leach Bliley Act (P.L. 106-102)(15 U.S.C. Section 6809) and implementing regulations thereof. These obligations shall survive termination of this Agreement.

Section 12. **Equal Opportunity.** The Parties agree that they shall not discriminate against any employee or applicant for employment because of race, creed, color, age, sex, national origin, marital status, liability for service in the armed forces, disability due to veteran status, status as a veteran of the Vietnam era, or the handicapped. The Parties further agree that they shall comply with all the requirements of the Equal Opportunity Clause set forth in Executive Order 11246, as amended, and its implementing instructions, as well as the Rehabilitation Act of 1973 and the Vietnam Era Veterans' Readjustment Assistance Act of 1974. The Parties certify they do not and shall not maintain facilities for their employees in a segregated manner or permit their employees to perform their services at any location under their control where segregated facilities are maintained.

Section 13. **Authorization; Binding Agreement; Good Standing.** Fidelity and the Firm each have full power and authority to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement has been duly executed and delivered by the Firm and Fidelity and constitutes a legal, valid and binding obligation, enforceable against the Firm and Fidelity according to its terms. Neither the Firm, nor any partner, member, officer, attorney or employee of the Firm (i) has been or is currently under investigation by any governmental authority or professional organization for any alleged violation or breach of applicable rules or code of professional responsibility, any applicable codes of ethics, or any applicable rules of moral or ethical conduct that are promulgated by a state court, regulatory agency or professional licensing entity, or (ii) has been convicted of or is under investigation for any crime involving moral turpitude. The Firm will comply with all laws, rules and codes described in (i) and (ii) above, and shall immediately notify Fidelity if the Firm, or any of its representatives, is being investigated for or violates any law or applicable rule of professional conduct.

Saxon 0194

**Section 14.**    **Notices.**  Any notices required by this Agreement shall be in writing and delivered by registered mail, overnight courier service, telex, telegraph or telefax communication, addressed as follows:

In the case of Fidelity:

Fidelity National Foreclosure & Bankruptcy Solutions
1270 Northland Drive, Suite 200
Mendota Heights, MN 55120
Attention:  Lawrence C. Dingmann, Jr.
Telefax:  (651) 234-3601
E-mail:  larry.dingmann@fnfs.net

In the case of the Firm:

Mann & Stevens, P.C.
550 Westcott Street, Suite 560
Houston, Texas  77007
Attention:    Diana Stevens
Telephone:    (713) 293-3600
Telefax:    (713) 293-3636
E-mail:    dstevens@bmstexas.com and jmann@bmstexas.com

or at such other address or persons as a Party may designate in writing. All confidential correspondence must be sent to both Diana Stevens and June Mann by email and may not be sent via facsimile.

**Section 15.**    **Termination.**  If a Party breaches any term or condition of this Agreement, or fails to perform any obligation contained in this Agreement, then the non-defaulting Party may immediately terminate this Agreement upon written notice.  This Agreement is also terminable upon 30 days written notice by either Party at any time for any reason.  If the Firm terminates this Agreement, it will take such reasonable steps as are necessary to protect the interests of both Fidelity and the Client.  If the Firm is directed to return any or all files, the Firm shall do so within five (5) full business days from receipt of said request, along with a substitution of attorney / substitution of trustee. All original documents, correspondence, and pleadings shall be returned with the file, at no expense to either Fidelity.  The Client shall be responsible for all shipping charges.  In addition, upon completion of the file by substitute counsel, the Firm shall render a final bill for its fee in accordance with the attached Schedule D.  The Firm acknowledges that the Firm's legal file, together with all documents, papers and funds held in connection with any of the Services provided, remain the sole property of the Client and must promptly be returned to Fidelity upon termination.  In the event the Firm refuses to

Saxon 0195

promptly return said files as requested, the Firm agrees it will be liable for any reasonable loss incurred solely by the Firm.

Section 16.    **Indemnification.**  The Firm agrees to indemnify and hold harmless Fidelity and its Clients ("Indemnified Parties") to the extent sent forth herein. The Firm will fully reimburse the Indemnified Parties for any losses, liabilities, penalties, damages, expenses, or other harm or injury which the Indemnified Party may incur or suffer, or which may be asserted by any person or entity, including, but not limited to, reasonable attorney's fees and court costs proximately caused solely by negligence or intentionally wrongful conduct of the Firm.  The Firm also agrees to indemnify the Indemnified Parties for failure to meet any predetermined time frames/deadlines and procedures, as established by the Client, proximately caused solely by negligence or intentionally wrongful conduct of the Firm.

(a)    Outside Counsel. The Firm assumes all responsibility for the acts and omissions of any outside counsel or "of counsel" retained by the Firm (for example, counsel retained to assist in litigation or counsel retained to make court appearances in remote counties). The Firm assumes all responsibility for any subcontractor or independent contractor engaged directly by the Firm.

(b)    Excess Fees. The Firm shall reimburse the Client for any fees which are in excess of the agreed schedule of fees or which exceed any amount allowed by applicable governmental guidelines ro not agreed to by the Client. Overcharges, or penalties resulting from violations or errors will be the sole responsibility of the Firm.

Section 17.    **Successors and Assigns.**  This Agreement is binding upon and inures to the benefit of the Parties and their respective partners, heirs, executors, administrators, representatives, successors, and permitted assigns.

Section 18.    **Assignment.**  No rights or obligations of either Party may be assigned to any other person or entity without the prior written consent of the other.

Section 19.    **Miscellaneous.**  This Agreement contains the entire understanding of the Parties. No provision may be altered, amended, modified, waived or discharged in any way, except by written agreement of both Parties. If any provision of this Agreement is found to be void or unenforceable, the remainder of this Agreement shall not be affected.

Section 20.    **Termination of Prior Agreement.**  This Agreement, including all Exhibits, contains the entire Agreement between the Parties relating to the subject matter hereof.  All prior Agreements and all prior negotiations, representations, and communications relating to the same subject matter are superseded by this Agreement, except as to provisions relating to Fidelity's obligation to pay Mann & Stevens, P.C. for invoices generated between April 8, 2000 and August 31, 2001..

Mann

Saxon 0196

IN WITNESS WHEREOF, the Parties have executed this Agreement this 1st day of
September, 2001.

FIDELITY NATIONAL FORECLOSURE &           MANN & STEVENS, P.C.
BANKRUPTCY SOLUTIONS, a division of
FIDELITY NATIONAL TITLE COMPANY

                                          By: Diana Estala Stevens
Lawrence C. Dingmann, Jr.                     Diana Estala Stevens
Vice President and Division Counsel           President and Shareholder

Saxon 0197

---

**EXHIBIT A**

*FIDELITY NATIONAL FORECLOSURE SOLUTIONS NETWORK SCHEDULE OF SERVICES*

---

STATE:     Texas
FIRM:       Mann & Stevens ("Firm")
DATE:       October 2, 2007

SECTION I.     SERVICES PROVIDED BY THE FIRM TO FIDELITY

    A. The Firm shall provide Fidelity and its clients with competent legal representation on all Referrals, including adherence to appropriate standards of professional conduct;

    B. The Firm shall provide Fidelity and its clients with legal representation in a manner consistent with, and in compliance with, Fidelity's standards and procedures;

    C. The Firm shall provide Fidelity and its clients with expertise and knowledge related to the law and legal practice in the Jurisdiction and notifying Fidelity of changes in law related to the law and practices related to the Referrals;

    D. In the state of Texas, the Firm shall institute foreclosure proceedings in such manner as is required by the applicable investor guidelines, and take all the steps necessary to bring the foreclosure to sale within 60 days after the matter is referred by Fidelity to the Firm, unless either: (i) the borrower files for bankruptcy; or (ii) Fidelity and the Firm mutually agree an event has occurred which has caused a permissible delay in the foreclosure;

    E. In connection with bankruptcy Referrals, the Firm shall, upon request by Fidelity: (i) attend 341 hearings; (ii) object to the debtor's plan; (iii) file a motion for adequate protection; (iv) file a motion for relief from stay; (v) process a consent order/stipulation; (vi) prepare and send demand letters; and (vii) process other reasonable requests by Fidelity;

    F. The Firm shall follow these timeframes for bankruptcy Referrals: (i) file a motion for relief from stay within 5 days after receipt of the Referral, unless a particular client requires a different timeframe; (ii) communicate motion filing and hearing results to Fidelity within 24 hours, and email final orders immediately upon receipt; and (iii) obtain relief from stay within 45 days after receipt of the Referral, unless Fidelity and the Firm agree an event has occurred which has caused a permissible delay in the bankruptcy;

    G. In connection with replevin actions, the Firm shall follow the timeframes and communication requirements as provided by Fidelity's standards and procedures; and

    H. The Firm shall update AMOS web or Lenstar, where applicable.

SECTION II.     SERVICES PROVIDED BY FIDELITY TO THE FIRM

    A. Fidelity shall maintain a national network ("Network") of service oriented attorneys who handle Referrals;

    B. Fidelity shall develop and implement marketing services to obtain clients for the Network;

    C. Fidelity shall prepare and deliver complete Referral packages to the Firm;

    D. Fidelity shall monitor the Referrals for compliance with investor and client due diligence guidelines;

    E. Fidelity shall facilitate client communication and provide per event, per loan and portfolio specific reports to clients regarding Referral status;

    F. Fidelity shall maintain loan data and documentation in client files and computer systems;

    G. Fidelity shall facilitate judgment figure calculations, as applicable;

    H. Fidelity shall calculate and process the VA 567 form and maintain the responsibility on providing this to the VA in the appropriate timeframes, when applicable;

Saxon 0198

<div style="border:1px solid">

## EXHIBIT A

### *FIDELITY NATIONAL FORECLOSURE SOLUTIONS  NETWORK SCHEDULE OF SERVICES*

</div>

SECTION II.    SERVICES PROVIDED BY FIDELITY TO THE FIRM

I.    Fidelity shall facilitate the calculations of all bids and provide them to the Firm in a timely manner;

J.    Fidelity shall prepare and mail all HUD Occupancy letters to the mortgagor, mortgagee and HUD, as applicable;

K.    Fidelity shall facilitate the ordering of all broker's price opinions and appraisals, and provide them to the appropriate parties, when applicable;

L.    Fidelity shall maintain all direct contact with the loan servicing customer and work with the customer on processing appropriate information requested by the mortgagor.  Such cases would include working with the collection/loss mitigation department on approval for Deed in Lieu's, short pays and repayment plans and the like;

M.    Fidelity shall maintain contact with investors, agencies, mortgage insurance companies and other appropriate signatory offices to obtain executed documents needed in the foreclosure, bankruptcy, or other action;

N.    Fidelity shall request all VA cut off extensions if advised by the Firm that we are unable to meet the required timeframes, when applicable;

O.    Fidelity shall request all HUD first action extensions if advised by the Firm that we are unable to meet the required timeframe, when applicable;

P.    Fidelity shall prepare and track the filing of any Proof of Claim required in an applicable bankruptcy;

Q.    Fidelity shall oversee the plan review process in connection with an applicable bankruptcy;

R.    Fidelity shall compile figures and financials for any bankruptcy Referral;

S.    Fidelity shall assemble the loan documents for any bankruptcy Referral;

T.    Fidelity shall compile, scan, and email all necessary information to the Firm;

U.    Fidelity shall monitor the status of an applicable motion for relief from stay;

V.    Fidelity shall assist in the research of billing inquiries and breakdowns;

W.    Fidelity shall order valuations, as applicable;

X.    Fidelity shall facilitate the calculation of post petition and contractual reinstatement figures;

Y.    Fidelity shall approve agreed order terms;

Z.    Fidelity shall track and monitor agreed order payments;

AA.    Fidelity shall track and review the final bankruptcy order;

BB.    Fidelity shall, when requested, close the client's bankruptcy tracking system;

CC.    Fidelity shall provide direction to the Firm for institution or reinstitution of a foreclosure action after the appropriate bankruptcy issues have been resolved to permit same, when applicable;

DD.    Fidelity shall monitor the status of a replevin action, when applicable;

EE.    Fidelity shall endeavor to standardize all processes and procedures requisite to managing defaulted loans from its multi-loan servicer, multi-platform customer base to provide operational and communication efficiencies to the Firm.

**Saxon 0199**

**EXHIBIT B**

**FIDELITY NATIONAL FORECLOSURE SOLUTIONS**
**NETWORK FEES FOR SERVICES SCHEDULE FOR *MERITECH***

State:  Texas
Firm:  Mann & Stevens
Date:  March 27, 2002

|  | Fees Billed to Client (Client Amount) | Fees Paid by Atty to Fidelity (Admin Fees)** |
|---|---|---|
| **I. Foreclosure Fees*** | | |
| A.  Freddie Mac | $500.00 | $125.00 |
| B.  FHA | $550.00 | $125.00 |
| C.  VA | $550.00 | $125.00 |
| D.  Fannie Mae | $550.00 | $125.00 |
| E.  Other Loan Types | $550.00 | $125.00 |
| **II. Eviction Fees** | | |
| A.  Freddie Mac | $300.00 | $75.00 |
| B.  FHA | $300.00 | $75.00 |
| C.  VA | Directed by VA | Directed by VA |
| D.  Fannie Mae | $275.00 | $75.00 |
| E.  Other Loan Types | $300.00 | $75.00 |
| **III. Deed in Lieu of Foreclosure** | | |
| A.  Freddie Mac | $200.00 | $50.00 |
| B.  FHA | $350.00 | $50.00 |
| C.  VA | $350.00 | $50.00 |
| D.  Fannie Mae | $350.00 | $50.00 |
| E.  Other Loan Types | $350.00 | $50.00 |

* NOTE: For loans not subject to G.S.E. or Government Agency prescribed flat fees, FNMA fee caps will apply.

Uncontested Home Equity Judicial Foreclosures are $1,100.00 with a $125.00 Administrative Fee.

| **IV. Additional Requests** | | |
|---|---|---|
| A.  Demand Letter (per letter) | $35.00 | $0.00 |
| B.  Drafting Missing Documents | $0.00 | $0.00 |
| C.  Title Claim Demand Letter | $125.00 | $0.00 |
| D.  Lost Note Affidavit | $35.00 | $0.00 |

Saxon 0200

**EXHIBIT B**

## FIDELITY NATIONAL FORECLOSURE SOLUTIONS
## NETWORK FEES FOR SERVICES SCHEDULE FOR *MERITECH*

|  |  | Fees Billed to Client (Client Amount) | Fees Paid by Atty to Fidelity (Admin Fees)** |
|---|---|---|---|
| E. | Nonstandard Per Hour Fee | $125.00 | $0.00 |
| F. | All Other Costs | Pass Through | $0.00 |
| **V. Bankruptcy Fees** | | | |
| 1. Objection to Plan/Defense of Proof of Claim | | | |
| | a. Objection Resolved | $200.00 | $50.00 |
| | b. File Review | $100.00 | $50.00 |
| 2. Motion for Relief: | | | |
| | (a) Mfr Complete | $600.00 | $150.00 |
| | (b) Mfr prepped or filed | $400.00 | $100.00 |
| | (c) File Review | $200.00 | $100.00 |
| 3. Motion for Relief (FHLMC Chapter 7) | | | |
| | (a) MFR Complete | $400.00 | $100.00 |
| | (b) MFR prepped or filed | $300.00 | $100.00 |
| | (c) File Review | $200.00 | $100.00 |
| 4. Agreed Order Default: | | | |
| | a. Notice of Default | * | ** |
| | b. Final Affidavit of Default | $0.00 | $0.00 |
| | c. Ex Parte Order | $0.00 | $0.00 |
| 5. Additional Hearings, Per Hearing | | $125.00 | $0.00 |
| 6. Hourly Fees (includes cramdowns) | | $125.00 | $0.00 |

** Firm will not be invoiced for an admin fee on any FNMA or FHLMC file referred pursuant to the FNMA or FHLMC designated counsel program.

*To be paid by client from first cure funds sent by debtor

Approved and Agreed to by _Dee_ /
                        Diana Etala Stevens
                        for Mann & Stevens, P.C

**Saxon 0201**

## EXHIBIT C
### FIDELITY NATIONAL FORECLOSURE SOLUTIONS NETWORK MODIFIED FEE SCHEDULE

STATE:    Texas
FIRM:    Mann & Stevens ("Firm")
DATE:    October 2, 2007

If Fidelity provides the Firm with either written or oral notice to stop a foreclosure at any time prior to the sale of the real property being completed, then the Fees paid to the Firm pursuant to Exhibits B shall be modified as outlined in this schedule. **THE FIRM WILL BE BILLED THE FULL ADMINISTRATIVE FEE REGARDLESS OF WHEN THE FORECLOSURE IS TERMINATED OR TRANSFERRED.**

### SECTION I.    FEES FOR NON-JUDICIAL FORECLOSURES

| Event | Modified Fee |
|---|---|
| A.    File received by Firm and title ordered/received | 30% of the fee described in Exhibits B & C |
| B.    Foreclosure documents prepared, service is awaiting publication/posting | 60% of the fee described in Exhibits B & C |
| C.    Up to and including publication started | 90% of the fee described in Exhibits B & C |

### SECTION II.    FEES FOR JUDICIAL FORECLOSURES

| Event | Modified Fee |
|---|---|
| A.    File in, up to and including title ordered/received | 30% of the fee described in Exhibits B & C |
| B.    Up to and including complaint drafted/sent/filed | 50% of the fee described in Exhibits B & C |
| C.    Up to and including service started/completed | 70% of the fee described in Exhibits B & C |
| D.    Up to and including judgment sent/entered | 90% of the fee described in Exhibits B & C |

**Saxon 0202**